# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Khalaj, et al., | No. CV-17-04802-PHX-DJH (CDB) |
| Plaintiffs, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

Plaintiffs David Khalaj and Juliet David Youmaran, who are represented by counsel, brought this case pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b)(1) and 2674. Defendant United States of America has filed a Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment. (Doc. 95.) Plaintiffs oppose the Motion. (Doc. 109.)

On April 23, 2020, the Court ordered the parties to submit an additional brief addressing the applicability of 28 U.S.C. § 2680(h) and the law enforcement proviso to Plaintiffs' intentional tort claims. (Doc. 114.) Plaintiffs filed their supplemental brief (Doc. 115) on May 7, 2020, as did Defendant (Doc. 116).[1]

**I.    Background**

In the Complaint, Plaintiffs allege that on January 1, 2016, they were "illegally assaulted, detained and imprisoned" by United States Customs and Border Protection

---

[1] On May 8, 2020, Plaintiffs filed a Motion to Strike Defendant's supplemental brief, which Magistrate Judge Bibles denied in a May 27, 2020 Order.

1 (CBP) Officers as they were passing through a CBP-secured area (Customs Area) in Sky Harbor Airport in Phoenix, Arizona. (Doc. 1 at 2 ¶ 5.) Plaintiffs assert claims under the FTCA, specifically, assault and battery, illegal detainment and imprisonment, and negligence. (*Id.* at 6-9.) Plaintiffs allege that the personal injuries and resulting damages they suffered were proximately caused by the negligence, wrongful acts and/or omissions of employees/officers of the United States of America acting through its agency, CBP. (*Id.* at 2 ¶ 6.)

Defendant moves to dismiss this case for lack of jurisdiction and failure to state a claim, or, in the alternative, for summary judgment. (Doc. 95 at 1.)

## II. Motion to Dismiss for Lack of Subject Matter Jurisdiction

### A. Legal Standard

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, dismissal is appropriate when the court lacks subject matter jurisdiction over a claim. Fed. R. Civ. P. 12(b)(1). Subject matter jurisdiction involves the power of the Court to hear a plaintiff's claims in the first place and, therefore, imposes upon courts an affirmative obligation to ensure that they are acting within the scope of their jurisdictional power. Because federal courts are courts of limited jurisdiction, it is presumed that a cause lies outside the jurisdiction of federal courts unless proven otherwise. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). The plaintiff bears the burden of establishing that jurisdiction exists. *Tosco Corp. v. Communities for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001); *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

"'A motion to dismiss for lack of subject matter jurisdiction may either attack the allegations of the complaint or may'" attack the existence of subject matter jurisdiction as a matter of fact. *Nat'l Union Fire Ins. Co. v. ESI Ergonomic Solutions, LLC*, 342 F. Supp. 2d 853 (D. Ariz. 2004) (quoting *Thornhill Publ'g Co.*, 594 F.2d at 733). "When a motion to dismiss attacks the allegations of the complaint as insufficient to confer subject matter jurisdiction, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Id. (citing Fed'n of African Amer. Contractors v. City*

*of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996)).  Where the jurisdictional issue is separable from the merits of the case, the Court may consider the evidence presented with respect to the jurisdictional issue, resolving factual disputes if necessary. *Thornhill Publ'g Co.*, 594 F.2d at 733.  "When the motion is a factual attack on subject matter jurisdiction, a defendant may 'rely on affidavits or any other evidence properly before the Court.'" *Nat'l Union Fire Ins. Co.*, 342 F. Supp. 2d at 861 (citing *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989)).  In the instance of a factual challenge, no presumption of truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating the merits of jurisdictional claims. *Thornhill Publ'g Co.*, 594 F.2d at 733.

When a motion to dismiss is based on more than one ground, the court should consider the Rule 12(b)(1) challenge first because the other grounds will become moot if the court lacks subject matter jurisdiction.  5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure,* § 1350 (2004 ed.)

**B.    Facts**

On January 1, 2016, Plaintiffs Khalaj and Youmaran took a direct flight from Mexico to Sky Harbor Airport.  (Doc. 96 at 2-3 ¶ 8.)  When they deplaned, Plaintiffs proceeded to the Customs Area at approximately 4:15 p.m.  (*Id.* at 3 ¶ 9.)  Khalaj presented a CBP Declaration Form at the primary inspection area indicating there were four members in his party and held receipts identifying each party member.  (*Id.* ¶ 10.)  Plaintiffs proceeded with their children to the baggage carousel.  (*Id.* ¶ 11.)  Khalaj left his wife and children waiting for the luggage and walked to the egress point holding a bag containing cigarettes.  (*Id.* ¶ 12.)

CBP Officers James Townsend and J. Mata were manning two stations at the egress point.  (*Id.* ¶ 13.)  Townsend observed Khalaj walk up to the egress point.  (*Id.* ¶ 14.)  When Khalaj got in line at the egress point, he did not have a Declaration, and he was told he needed a Declaration form and passport to leave.  (*Id.* ¶ 15.)  Khalaj told Townsend that he needed to leave to get something to eat and wanted to smoke a cigarette.  (Doc. 110 at 3

¶ 16.) Townsend did not allow Khalaj to exit the Customs Area. (Doc. 96 at 3 ¶ 17.) Khalaj turned around and walked back toward the baggage carousels. (*Id.* ¶ 18.)

A few minutes later, Khalaj went back to the egress point with the Declaration and receipts but without his luggage or children. (*Id.* ¶ 19.) Youmaran followed behind Khalaj. (*Id.* ¶ 20.) Khalaj approached and spoke with CBP Officer Mata and again attempted to leave the Customs Area. (*Id.* ¶ 21.) Mata explained that Khalaj had to have his children and bags with him before he could leave the Customs Area, and Khalaj informed Mata he was diabetic. (*Id.* at 4 ¶ 22.) Khalaj told Mata that he did not "know what the big deal is," and he was treated better in Mexico than he was being treated in the Customs Area. (*Id.* ¶ 23.) Khalaj also complained, "This is absolutely absurd that we have to go through so much, and I'm hungry and I need to eat something." (*Id.* ¶ 24.)

Mata placed a call on the radio and requested a supervisor. (*Id.* ¶ 25.) Supervisor Maria Sisson responded to the call at 4:20 p.m. and learned that Khalaj was diabetic, wanted food, and wanted to leave the Customs Area without his family. (*Id.* ¶ 26.) Sisson walked to the secondary inspection area with Plaintiffs and directed them to sit down, and Khalaj complied. (*Id.* ¶¶ 27-28.) During this time, Khalaj's children remained at the carousels waiting for the family's luggage. (*Id.* ¶ 29.)

Sisson went to talk to Mata to obtain further information because CBP does not allow passengers to leave unless they have the telephone number of the individuals on the Declaration. (Doc. 110 at 4 ¶ 30.) Chief CBP Officer Juan Osorio also arrived in the area, and Khalaj stood and approached Osorio and Sisson. (*Id.* ¶ 31.) CBP Officer Jose Colunga, who was manning an inspection desk near the egress point, saw Khalaj using hand gestures while speaking with Sisson. (*Id.* at 5 ¶ 33.) Colunga testified that he believed Khalaj was arguing with Sisson. (Doc. 96-1 at 179.)

Colunga got up and walked to where Osorio was standing. (Doc. 96 at 5 ¶ 34.) Osorio testified that he observed Khalaj making comments as to why CBP was not allowing him to leave, using vulgar language, and raising his hands while talking. (Doc. 96-1 at 24.) Plaintiffs dispute this and assert that Khalaj did not use vulgar language before he was

"confronted and hit" by Osorio and Colunga. (Doc. 110 at 5 ¶ 35.) Osorio testified that he believed Khalaj was not listening to Sisson and heard Khalaj say, "Your bullshit rules. I'm an American citizen. I should be allowed to leave." (Doc. 96-1 at 25.) Youmaran testified that Khalaj told Sisson, "I'm an American citizen. I am diabetic. I'm very hungry/thirsty. I haven't ate. You guys have water, maybe something sweet that could spike his sugar up. He says, I'm an American. I was treated better in Mexico than I am here." (Doc. 96-1 at 377.)

Sisson testified that during her interaction with Khalaj, she explained to Khalaj that he could not immediately leave and "the reason why we normally don't allow people to leave without their whole party." (Doc. 96-2 at 12.) Sisson left the area to try to obtain more information from Mata. (*Id.* at 16.) Colunga testified that he heard Khalaj yell, "Motherfuckers," and say, "I'm a U.S. citizen. Is this . . . how you treat me, a U.S. citizen?" (Doc. 96-1 at 176.) Plaintiffs dispute this and assert that Colunga never overheard any communication between Sisson and Khalaj before Colunga and Osorio appeared on the scene. (Doc. 110 at 5 ¶ 38.) Townsend testified that from his vantage point, he heard Khalaj raise his voice and saw Khalaj use his hands in an "animated" manner, causing Townsend to believe Khalaj was getting upset. (Doc. 96-1 at 113-14.) Plaintiffs dispute this and assert that at no time did Townsend overhear any portion of the conversation between Khalaj and any other CBP officer or supervisor. (Doc. 110 at 6 ¶ 39.)

CBP Agricultural Specialist Robert Milbourn was also posted in the secondary area at that time. (Doc. 96 at 5 ¶ 40.) Milbourn wrote in a witness statement that he saw Khalaj become "very agitated" and heard Khalaj raise his voice, and Milbourn then left his station and joined Colunga, Sisson, and Osorio. (Doc. 96-2 at 49.) Khalaj "took steps to walk away from the officers," but Colunga "did not permit that de-escalation." (Doc. 110 at 6 ¶ 42.) Osorio testified that Khalaj was "pointing a finger in [Osorio's] face," which Osorio interpreted as Khalaj being "aggressive" or "assaultive." (Doc. 96-1 at 41-43.) Osorio testified that he "had a feeling" that Khalaj was "trying to harm [them] and Supervisor Sisson." (*Id.* at 43.) Osorio testified that Khalaj's demeanor, vulgar language, hand

motioning, finger point, and noncompliance led him to believe that Khalaj could do something harmful or harm Sisson. (*Id.*) Osorio testified that Khalaj was "causing a commotion" and that other passengers were nearby listening to it. (*Id.* at 28.) Colunga testified that Khalaj attempted to walk away, and Colunga saw Khalaj take steps towards the exit area. (*Id.* at 186.)

Osorio and Colunga both used verbal commands instructing Khalaj to take a seat and to calm down. (Doc. 96 at 6 ¶ 46.) Khalaj did not take a seat at that time. (*Id.* ¶ 47.) "[W]ithout warning[,] the officers hit [] Khalaj's right shoulder to force him to move," and Khalaj tried to walk away from the interaction." (Doc. 110 at 7 ¶ 49.) Osorio testified that he attempted to use an escort hold on Khalaj, a technique used when a "resistive" passenger does not comply with an officer's order. (Doc. 96-1 at 31.) Osorio testified that enough pressure is applied in an escort hold to "make sure you have a good hold on the subject . . . so the subject won't fidget away." (*Id.* at 33.) Osorio testified that Khalaj was "resisting" Osorio's direction to take a seat. (*Id.* at 34.) Osorio testified that he did not simply walk away from the situation to speak to Supervisor Sisson and "figure out what [they] wanted to do" because Osorio did not want to leave Khalaj unattended. (*Id.* at 34-35.)

Osorio testified that when he attempted the escort hold, Khalaj said, "Don't touch me," or "Don't fucking touch me," which Osorio took as a "comment of aggression," along with the way Khalaj was acting and "moving his arms." (*Id.* at 36-37.) Osorio testified that "simply taking a step or two back" and trying to communicate with Khalaj as opposed to "touching [Khalaj] and put[ting] him in an escort hold" was not an option at the time because Osorio "had to ensure that [he] de-escalate[d] the situation." (*Id.* at 39.)

Milbourn wrote in his witness statement that Osorio "touched Khalaj lightly on the shoulder and pointed out the seats behind him, asking him to sit down." (Doc. 96-2 at 49.) Milbourn stated that Khalaj pushed Osorio's hand away and told him, "Don't you fucking touch me." (*Id.*) Milbourn wrote that Osorio "began to try to grip Khalaj by the triceps and lead him over to the seats to try and get him to sit and calm down." (*Id.*) According

to Milbourn, Khalaj "reacted to this by shoving [] Osorio away." (*Id.*) Milbourn stated that it appeared to him that Khalaj was "going to throw a punch." (*Id.*)

After Osorio hit Khalaj, Khalaj says he "voluntarily tried to remove himself from the situation" and never tried to touch any CBP officer. (Doc. 110 at 8 ¶ 54.) Osorio testified that as he took hold of Khalaj's arm, Khalaj swung his right arm around and punched Osorio. (Doc. 96-1 at 68.) Plaintiffs dispute that Khalaj swung his arm at Osorio. (Doc. 110 at 8 ¶ 54.) At that point, Osorio, Colunga, and Milbourn grappled with Khalaj and fell into the seating area. (Doc. 96 at 7 ¶ 55.) Townsend left his station and noticed Khalaj and Osorio were engaged in a struggle. (*Id.* ¶ 56.) Townsend testified that he heard Osorio and Colunga telling Khalaj to "calm down" and "sit down," but Khalaj did not comply. (Doc. 96-1 at 119.) Plaintiffs dispute this and assert that Townsend only overheard the command to "calm down" after the physical interaction started. (Doc. 110 at 8 ¶ 57.)

Townsend further testified that he heard Khalaj use a lot of "F-bombs" and observed Khalaj's arms flailing and legs kicking. (Doc. 96-1 at 126-27.) Plaintiffs dispute this and assert that Townsend did not observe any contact between Khalaj's arms and legs kicking and Osorio and Colunga, and that Townsend could not "see what Os[o]rio and Colunga's hands were doing to Khalaj." (Doc. 110 at 8 ¶ 59.) Townsend responded by using his hands to shield Khalaj's legs from kicking either Osorio or Colunga. (Doc. 96 at 7 ¶ 60.) Townsend saw Khalaj on the seats, kicking and swearing, and heard Youmaran telling her husband to calm down. (*Id.* ¶ 61.) Townsend also heard Colunga yell out, "Don't bite me!" (*Id.* ¶ 62.)

Milbourn observed Khalaj kicking and attempting to bite Colunga. (*Id.* ¶ 63.) Townsend heard Youmaran start screaming and talking about Khalaj's medical condition (stroke or diabetes). (*Id.* ¶ 64.) Townsend observed Youmaran start "clawing" at Colunga and told her, "Cut that out. Calm down." (*Id.* ¶ 65.) Colunga testified that during the struggle, Khalaj bit him on the arm. (Doc. 96-1 at 214.) Plaintiffs dispute this and assert that Khalaj did not bite any CBP officer. (Doc. 110 at 9 ¶ 67.) Colunga testified that when

Khalaj bit him, Colunga told him, "Stop biting me, fucker." (Doc. 96-1 at 214.) Osorio saw Khalaj turn his head and make a motion like he was biting Colunga and heard Colunga yell out that he had been bitten. (Doc. 96 at 7-8 ¶ 68.) Osorio attempted to move Khalaj's head away from him because Osorio "did not want to get bit." (*Id.* at 8 ¶ 69.)

As the struggle continued, Osorio used a "pressure point technique" to the middle of Khalaj's ear, pushed Khalaj's face away from him, and worked to handcuff Khalaj. (*Id.* ¶ 70.) Sisson testified that she felt "threatened" because of the "very loud" yelling and profanities and that the physical altercation "looked threatening." (Doc. 96-2 at 23.) Townsend put out a call on his radio for more Officers to come to the area. (Doc. 96 at 8 ¶ 72.) Sisson went to call the airport emergency number, asking for police and paramedics to respond. (*Id.* ¶ 73.) Meanwhile, Youmaran screamed and physically attempted to pull the Officers away from Khalaj. (*Id.* ¶ 74.) Milbourn "perceived" Youmaran throw herself on top of him, Osorio, and Colunga. (*Id.* ¶ 75.)

CBP Officer Oralia Villa was working at primary inspection when she heard a call over the radio at approximately 4:30 p.m., asking for all available Officers to report to the scene. (*Id.* ¶ 76.) When Villa arrived, she observed Officers attempting to control Khalaj and observed Youmaran pushing the Officers. (*Id.* ¶ 77.) Villa reached for Youmaran's right arm, and Youmaran hit Villa in the chest and shoulder area. (*Id.* ¶ 78.) CBP Officer Arpad Domokos was in a primary processing booth when he heard the call for assistance. (*Id.* ¶ 79.) When Domokos arrived at the scene, Domokos heard Youmaran screaming "Don't touch my husband!" (*Id.* ¶ 80.) Domokos told Youmaran to calm down and tried to pull her away from her husband, but Youmaran screamed and grabbed his hand. (*Id.* at 8-9 ¶ 81.) Youmaran "jumped up and down," screamed at the Officers, and told her husband to calm down. (*Id.* at 9 ¶ 82.)

Townsend saw Officer Villa arrive, and he and Villa moved Youmaran away from Khalaj. (*Id.* ¶ 83.) CBP Officer Matthew Gardner also responded to the scene. (*Id.* ¶ 84.) Gardner testified that when he arrived, Khalaj was "struggling on the floor" with two or three officers. (Doc. 96-1 at 305.) Gardner testified that the officers were "attempting to

gain control and control [Khalaj's] hands to maneuver him to handcuff him." (*Id.*) Gardner testified that "there was much struggling going on," and that what he observed was not "simple compliance." (*Id.* at 306.) Gardner testified that Khalaj "was not submitting"; rather, it appeared to Gardner that Khalaj was "essentially resisting." (*Id.*) Gardner then holstered his Taser and helped Villa handcuff Youmaran. (Doc. 96 at 9 ¶ 86.)

During the altercation, Khalaj used profanity, such as "Sons of bitches," and "Everyone one [sic] of you are pieces of shit!" (*Id.* ¶ 88.) Youmaran also used profanity, such as "Fucking assholes," "You get the fuck out of here," and "Asshole! Fuck off!" (*Id.* ¶ 89.) Townsend assisted Osorio and Colunga in handcuffing Khalaj on the ground, stood him up, and walked him to a holding cell with Osorio. (*Id.* at 10 ¶ 92.) Gardner and Villa escorted Youmaran to the holding cell and sat her down. (*Id.* ¶ 93.) Once in the cell, CBP Officers noticed Youmaran still had her cell phone. (*Id.* ¶ 94.) The officers did not ask Youmaran for the cell phone, and she had not been searched by any officer. (Doc. 110 at 14 ¶ 6.) Gardner reached behind Youmaran to retrieve the phone from her hands, which were behind her back. (Doc. 96 at 10 ¶ 95.) This surprised Youmaran, and she kicked Gardner in the leg. (*Id.*; Doc. 110 at 14 ¶ 6.) Gardner kneed Youmaran in her abdomen and neck. (Doc. 110 at 14 ¶ 6.) Villa saw Youmaran kick Gardner and pulled Youmaran to the side on the bench. (Doc. 96 at 10 ¶ 97.) Gardner then retrieved Youmaran's cell phone. (*Id.* ¶ 98.)

### C. Discretionary Function Exception

Defendant asserts that the Court lacks subject matter jurisdiction over this case because the discretionary function exception under the FTCA bars Plaintiffs' claims. (Doc. 95 at 8.)

#### 1. Legal Standard

It is well-settled that the United States can be sued only to the extent that it has waived its sovereign immunity. *Conrad v. United States,* 447 F.3d 760, 764 (9th Cir. 2006) (citation omitted). The FTCA "waives the federal government's immunity from suit for a discrete class of lawsuits." *O'Toole v. United States,* 295 F.3d 1029, 1033 (9th Cir. 2002)

(citing 28 U.S.C. §§ 2671–2680). The FTCA provides for governmental liability for negligent or wrongful acts or omissions of a federal employee acting within the scope of his or her employment "if a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *see also* 28 U.S.C. § 2674 ("The United States shall be liable . . . relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . ."); *O'Toole,* 295 F.3d at 1033. The Supreme Court has noted that "[t]he broad and just purpose which the statute was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not leave just treatment to the caprice and legislative burden of individual private laws." *Indian Towing Co. v. United States,* 350 U.S. 61, 68 (1955).

The waiver of sovereign immunity under the FTCA is subject to number of exceptions. *Gen'l Dynamics Corp. v. United States,* 139 F.3d 1280, 1283 (9th Cir. 1998). "If an exception applies, sovereign immunity is not waived, and no subject matter jurisdiction exists." *Id.* (citing *Sabow v. United States,* 93 F.3d 1445, 1451 (9th Cir. 1996)).

The discretionary function exception to the waiver of sovereign immunity under the FTCA precludes tort liability for:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise of performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a); *see also O'Toole,* 295 F.3d at 1033.

The discretionary function exception applies when two requirements are met. *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008). First, the government's conduct must be discretionary, with no federal statute, regulation, or policy prescribing a specific course of action. *Id.* To be discretionary, the conduct "must involve an element of judgment or choice." *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir.

2002). "In addition to duties prescribed by the common law torts 'of the place where the act or omission occurred,' federal employees must follow "federal statute[s], regulation[s], or polic[ies that] specifically prescribe[ ] a course of action for an employee to follow." *Gonzalez v. United States*, 814 F.3d 1022, 1027 (9th Cir. 2016) (quoting *GATX/Airlog Co.*, 286 F.3d at 1173). "In such cases, "the employee has no rightful option but to adhere to the directive," and the discretionary function exception does not apply. *GATX/Airlog Co.*, 286 F.3d at 1174. "Thus, where conduct violates a mandatory directive and is not 'the product of judgment or choice,' it is not discretionary." *Gonzalez*, 814 F.3d at 1027 (quoting *Berkovitz*, 486 U.S. at 536).

Second, the action or decision must involve considerations of public policy. *Terbush*, 516 F.3d at 1129 (citing *Berkovitz*, 486 U.S. at 536-37). The Court must determine whether the judgment or choice at issue "is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. The Court must focus "not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991). The challenged decision "need not actually be grounded in policy considerations" so long as it is, "by its nature, susceptible to a policy analysis." *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998). The determination of whether given conduct falls within the discretionary function exception must focus on the "nature of the conduct, rather than the status of the actor." *Gaubert*, 499 U.S. at 322. The Supreme Court has also recognized that when a statute or regulation allows a federal agent to act with discretion, there is a "strong presumption" that the authorized act is based on an underlying policy decision. *Id.* at 324.

### 2. Parties' Contentions

Defendant contends when the Government performs a discretionary function, the negligent performance of that function does not invalidate the discretionary function exception. (*Id.* at 9.) Defendant argues that the CBP Officers' decision that Khalaj could

1  not exit the Customs Area and had to wait for his family and luggage and their actions in
2  carrying out that decision was discretionary. (*Id.* at 10.)

3　　　　In their Response, Plaintiffs contend that "no written policy exists prohibiting
4  departure from the Customs area by one family member separate and apart from other
5  family members, all of whom may be identified in a declaration form," and the "practice"
6  most of CBP Officers "described as a policy" was that all family members must leave
7  together from the secondary inspection point although they have all cleared the primary
8  inspection point. (Doc. 109 at 9.) Plaintiffs assert that the *exception* to this practice or
9  policy was that less than the entire family identified in the declaration form could depart
10 the egress area if officers obtained telephone numbers for the other family members. (*Id.*
11 at 9-10.) Plaintiffs contend that before Sisson "had a full opportunity to interact" with
12 Khalaj after acquiring more information, other CBP officers intervened, "prohibiting the
13 follow through, employment of the exception to the policy/practice that all family members
14 must depart together." (*Id.* at 10.) Thus, Plaintiffs argue, "the first part of the two part
15 *Gaubert* test has not nor can be met." (*Id.*)

### 3.　　　Analysis

17　　　　As Defendant points out, Plaintiffs fail to address the second prong of the *Gaubert*
18 test, and their argument regarding the applicability of the first prong misses the point. (Doc.
19 113 at 6.) Acknowledging that there is no written policy *prohibiting* the CBP Officers'
20 conduct, Plaintiffs attempt to characterize the relevant "policy" that prescribes the CBP
21 Officers' conduct as the unwritten policy or "practice" of requiring all family members to
22 leave together from the secondary inspection point. (Doc. 109 at 9.) Plaintiffs then purport
23 to identify a lone "exception" to this policy or practice, whereby less than the entire family
24 identified in the declaration form could depart the egress area if officers obtained telephone
25 numbers for the other family members. (*Id.*) Plaintiffs' attempt to distort the testimony to
26 fit their argument that the discretionary function exception does not apply is misguided.
27 As Defendant points out, the testimony Plaintiffs cite does the opposite of what Plaintiffs
28 would like the Court to believe: it establishes that the CBP Officers had a *choice* whether

to allow Khalaj to leave the Customs area, and they exercised *discretion* not to allow him to do so. Even if Sisson intended to make an exception to the general "practice," that only implies that Sisson likewise had a *choice* whether to apply the general practice. In sum, the Court finds that the CBP Officers' decision not to allow Khalaj to leave the Customs area falls within the discretionary function exception. Thus, Plaintiffs' negligence claim is barred.

However, as the Court noted in the April 23, 2020 Order, Plaintiffs' claims are not based solely on the CBP Officers' decision not to allow Khalaj to leave the Customs area. That decision *triggered* the subsequent events, but that decision *alone* does not form the basis of Plaintiffs' intentional tort claims of false imprisonment and assault and battery. Rather, it was the exercise of discretion that led to the subsequent physical altercation and detention of Plaintiffs, which form the basis of Plaintiffs' intentional tort claims. The question, then, is whether the law enforcement proviso applies to those claims, and if so, whether the law enforcement proviso "trumps" the discretionary function exception to permit Plaintiffs' intentional tort claims to proceed.

### D. Law Enforcement Proviso

#### 1. Legal Standard

Generally, the FTCA does not waive sovereign immunity for intentional tort claims. *See* 28 U.S.C. § 2680(h). However, an exception exists, waiving sovereign immunity, where intentional torts are committed by investigative or law enforcement officers acting within the scope of their employment. *See id.* This exception is known as the "law enforcement proviso."

The intentional tort exception "preserves the Government's immunity from suit for '[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.'" *Millbrook v. United States*, 569 U.S. 50 (2013) (quoting 28 U.S.C. § 2680(h)). As noted, Congress has carved out an exception to § 2680(h)'s preservation of the United States' sovereign immunity for intentional torts by adding a proviso covering

claims that arise out of the wrongful conduct of law enforcement officers. *Id.* The "law enforcement proviso" extends the waiver of sovereign immunity to claims for six intentional torts, including assault and battery, that are based on the "'acts or omissions of investigative or law enforcement officers.'" *Id.* (quoting 28 U.S.C. § 2680(h)).

The proviso defines "'investigative or law enforcement officer'" to mean "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* (quoting 28 U.S.C. § 2680(h)). In *Millbrook*, the Supreme Court held that "the waiver effected by the law enforcement proviso extends to acts or omissions of law enforcement officers that arise within the scope of their employment, regardless of whether the officers are engaged in investigative or law enforcement activity, or are executing a search, seizing evidence, or making an arrest." *Id.* at 56. "On its face, the law enforcement proviso applies where a claim both arises out of one of the proviso's six intentional torts [assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution], and is related to the 'acts or omissions' of an 'investigative or law enforcement officer'" . . . who is "acting within the scope of his office or employment." *Id.* at 55 (quoting 28 U.S.C. § 1346(b)).

### 2. Parties' Contentions in Supplemental Briefs

In its supplemental brief, Defendant argues that the law enforcement proviso does not limit the application of the discretionary function exception. (Doc. 116 at 2.) Noting the Court's citation to *Nurse v. United States*, 226 F.3d 996 (9th Cir. 2000), Defendant contends that the Ninth Circuit concluded only that the plaintiff's false imprisonment, invasion of privacy, and negligence claims against federal agents did not appear, at that stage of the proceedings, to be protected by the discretionary function exception. (*Id.* at 2-3.) Defendant further observes that the Ninth Circuit's review in that case was based on the pre-answer motion to dismiss filed by the United States before any discovery had been conducted. (*Id.* at 3.)

Plaintiffs argue in their supplemental brief that the Supreme Court's decision in *Millbrook* "broadened the law enforcement proviso that extends the waiver of sovereign

immunity to acts or omissions of law enforcement officers acting within the scope of their employment regardless of whether they are specifically engaged in investigative or law enforcement activity." (Doc. 115 at 2.) Plaintiffs assert that "there is no clash as to the applicability of 28 U.S.C. § 2680(h) versus 28 U.S.C. § 2680(a), relating to discretionary function" because the Supreme Court in *Millbrook* made clear that § 2680(h) "is in fact not subject to an exception to the FTCA when a federal law enforcement officer is acting within the scope of employment and accused of intentional torts." (*Id.*)

### 3. Analysis

In "interpreting the interplay of section 2680(h) and the FTCA exceptions," the Ninth Circuit has been clear that if the Government shows that the tortious conduct alleged under section 2680(h) is exempt under one of the FTCA's enumerated exceptions to liability, then the plaintiff's claim is barred. *Gasho v. United States*, 39 F.3d 1420, 1433 (9th Cir. 1994) (dismissing, in part, claims filed pursuant to law enforcement proviso because alleged conduct fell within either the FTCA exception exempting liability regarding detention of goods by customs agents and other alleged conduct fell within the discretionary function exception). The Ninth Circuit recognized that such a holding "effectively bars any remedy for intentional torts with respect to" conduct falling within the FTCA's enumerated exceptions to liability, "[b]ut statutes waiving the sovereign immunity of the United States must be 'construed strictly in favor of the sovereign.'" *Id.* (quoting *McMahon v. United States*, 342 U.S. 25, 27 (1951), *superseded by statute on other grounds*). The *Gasho* court concluded that its holding "furthers Congress' intention in creating the" FTCA exemptions from liability. *Id.*

Likewise, the Ninth Circuit has been clear that the liability created by the law enforcement proviso is subject to the FTCA's discretionary function exception: "If a defendant can show that the tortious conduct involves a 'discretionary function,' a plaintiff cannot maintain an FTCA claim, even if the discretionary act constitutes an intentional tort under section 2680(h)." *Id.* at 1435 (dismissing intentional infliction of emotional distress/malicious intent claim regarding agents' investigation and preparation of case for

prosecution because such actions fell within discretionary function exception *but* declining to dismiss intentional infliction of emotional distress claim with regard to "[t]he agents' conduct during the arrest" where question of fact remained whether arresting officers were motivated by malice); *see also Nurse*, 226 F.3d at 1002-03. Thus, Ninth Circuit precedent forecloses Plaintiffs' argument. The Court finds that Plaintiff's intentional tort claims allege conduct that involves a discretionary function, and therefore, the Court lacks subject matter jurisdiction over Plaintiffs' intentional tort claims.

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss for lack of subject matter jurisdiction.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendant's Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment (Doc. 95) and Plaintiffs' Motion for Oral Argument (Doc. 111).

(2) Defendant's Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment (Doc. 95) is **granted** and the Complaint (Doc. 1) and this action are **dismissed without prejudice** for lack of subject matter jurisdiction

(3) Plaintiffs' Motion for Oral Argument (Doc. 111) is **denied as moot**.

(4) This action is **terminated**; the Clerk of Court must enter judgment accordingly.

Dated this 24th day of July, 2020.

Honorable Diane J. Humetewa
United States District Judge